**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

ANTHONY SANDERS,

                   Plaintiff,

      v.

                                No. 9:19-CV-697
TORRES, et al.,                                (GTS/CFH)

                   Defendants.

_____

**APPEARANCES:**                          **OF COUNSEL:**

Anthony Sanders
17-A-5184
Elmira Correctional Facility
Elmira, New York 14902
Plaintiff pro se

Attorney General for the                AIMEE COWAN, ESQ.
State of New York                   Assistant Attorney General
Syracuse Regional Office
300 South State St.
Syracuse, New York 13202
Attorney for Defendants

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

       Plaintiff pro se Anthony Sanders ("plaintiff"), who was, at all relevant times, in the

custody of the New York State Department of Corrections and Community Supervision

("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants

Correction Officer ("C.O.") W. Torres ("C.O. Torres"); C.O. E. Sadowski ("C.O.

---

[1] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Sadowski"); C.O. N. Grzeskowiak ("C.O. Grzeskowiak"); and C.O. S. Skelly ("C.O. Skelly") (collectively, where appropriate, "defendants") —who, at all relevant times were employed at Auburn Correctional Facility ("Auburn C.F.")—violated his constitutional rights under the Eighth Amendment through the use of excessive force.  See Dkt. No. 1 ("Compl.").[2]

Presently pending before the Court is defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").  See Dkt. No. 19.  Plaintiff opposed the motion, see Dkt. No. 24, and defendants filed a reply. See 25.  For the reasons that follow, it is recommended that defendants' motion be granted in its entirety and that plaintiff's Complaint be dismissed with prejudice.


# I. Background

## A. Facts

The facts are reviewed in the light most favorable to plaintiff as the non-moving party.  See subsection III., infra.  At all relevant times, plaintiff was an inmate incarcerated at Auburn C.F.


### 1.  Plaintiff's Complaint

#### a. Incident Involving C.O.s Sadowski, Grzeskowiak, and Skelly

On May 12, 2019, at approximately 7:00 A.M., while C.O. Sadowski, C.O. Grzeskowiak, and C.O. Skelly were conducting a frisk of plaintiff's cell,  plaintiff alleges

---

[2]  Following initial review of plaintiff's Amended Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), Chief United States District Court Judge Glenn T. Suddaby dismissed, without prejudice, plaintiff's only other claim for Eighth Amendment deliberate medical indifference.  See Dkt. No. 5 at 9.  Plaintiff did not file an amended complaint in this action.

that C.O. Sadowski "assaulted" him by "striking [him] on the right side of [his] face for no reason which lead to these officer's [sic] using excessive force violating [his] 8th Amendment [sic]."  Compl. at 4.


### b. Incident Involving C.O. Torres

Plaintiff alleges that, at approximately 7:49 A.M. on May 12, 2019, while "being frisked by [C.O.] Torre" "in SHU . . . Hold," C.O. Torres asked plaintiff to "bend at the waist during a full strip frisk."  Id.  Plaintiff contends that, when he complied with C.O. Torres' order, C.O. Torres "put [him] in a rear naked choke hold around [his] neck for supposedly trying to swallow something (which nothing was found on contraband watch)."  Id.  Moreover, plaintiff alleges that he was "put to sleep by [C.O.] Torres" and that he was "woken up by officers slapping [him] to wake up."  Id.  Plaintiff avers that this incident was captured on camera and witnessed by other inmates.  See id. at 4-5. Plaintiff alleges that, as a result of C.O. Torres' choke hold, he "sustained a 1 inch in length abrasion an [sic] another on [his] left arm," but that he does not "know how many inches in length" the abrasion on his left arm was.  Id. at 5.


## II. Present Motion

### A. Defendants' Motion for Summary Judgment: Arguments and Supporting Evidence

### 1. Exhaustion of Administrative Remedies

Defendants first contend that plaintiff's complaint must be dismissed for failure to exhaust his administrative remedies prior to commencing this action, as required by the Prison Litigation Reform Act ("PLRA").  See Dkt. No. 19-28 at 10.  In support of their

contention, defendants proffer the declaration and supporting documentation of Rachael Seguin ("Seguin"), the Assistant Director of DOCCS' Inmate Grievance Program ("IGP"), whose duties include maintaining records of the Central Office Review Committee ("CORC"), "the body that renders the final administrative decision under DOCCS' [IGP] pursuant to 7 N.Y.C.R.R. § 701 *et seq.*"  Dkt. No. 19-24 at 1 ¶ 3.  Seguin stated that, at all relevant times, "Auburn had a fully functioning inmate grievance process available."  Id. at 3 ¶ 11.  Based on her search of plaintiff's CORC records, Seguin stated that plaintiff filed two grievances relating to the alleged May 12, 2019 excessive force incidents on May 28, 2019 (Grievance #AUB-76216-19) and June 5, 2019 (Grievance #AUB-76278-19).  See id. 3 ¶ 12; see also Dkt. No. 19-25 at 1 (plaintiff's CORC records listing plaintiff's May 28 and June 5, 2019 grievances).  Seguin explained that, "[a]t the time [plaintiff] filed his Complaint with the Court, the Superintendent responses were still within the 25[-]calendar day[-]time limit outlined in 7 N.Y.C.R.R. § 701.8(f)."  Id. at 3-4 ¶ 14.  Further, Seguin noted that the Superintendent "denied plaintiff's grievances on July 3, 2019, *after* [p]laintiff filed his Complaint" in this action on June 12, 2019, and that plaintiff "submitted appeals to CORC for both grievances on July 12, 2018, which were received and processed by the IGRC office at Auburn on July 31, 2019."  Id. at 4 ¶¶ 14, 15.  As of the date of Seguin's declaration, February 27, 2020, "[p]laintiff's CORC appeals [we]re pending and ha[d] not yet been heard or decided by CORC."  Id. at ¶ 16.

Moreover, pointing to Seguin's declaration, defendants contend that no exception to the mandatary exhaustion requirements exists here, because the grievance procedure was "'available'" to plaintiff at all times.  Dkt. No. 19-28 at 11 (citing Dkt. No.

19-24 at 3 ¶ 11).  Defendants also noted that plaintiff has not alleged that the Auburn

administration "'thwarted' him from taking advantage of the grievance process in any

way," Dkt. No. 19-28 at 11 (quoting Ross v. Blake, ____ U.S. ____ 136 S. Ct. 1850,

1862 (2016)), and note that plaintiff acknowledged at his deposition that he was familiar

with the grievance process while incarcerated at Auburn C.F.  See id. (citing Dkt. No.

19-2 at 97).  In addition, defendants aver that any delay in CORC rendering a decision

had no bearing on plaintiff's failure to exhaust administrative remedies "at the time he

filed his suit." Id. (emphasis and citation omitted).

## 2. Eighth Amendment Claims
### a. C.O.s Sadowski, Grzeskowiak, and Skelly

As an initial matter, defendants posit that, even assuming that plaintiff's

allegation that C.O. Sadowski struck him once in the head causing an abrasion are true,

plaintiff has alleged only *de minimis* force and insufficient physical injury, such that

plaintiff has failed establish the objective prong for an Eighth Amendment excessive

force claim.  See Dkt. No. 19-28 at 15-18.  Defendants further aver that, insofar as the

Complaint may be construed as asserting failure to intervene claims against C.O.s

Skelly and Grzekowiak, such claims must be dismissed because the underlying

excessive force claim against C.O. Sadowski must fail.  See id. at 19.  Alternatively,

defendants contend that plaintiff's failure to intervene claims fail because, accepting

plaintiff's allegations concerning C.O. Sadowski as true, the purported use of force—an

unexpected strike—would not have allowed C.O.s Skelly and Grzekowiak a reasonable

opportunity to intervene to stop the force.  See id. at 22.

In support of their arguments in this regard, defendants controvert plaintiff's recitation of the facts, and proffer the declaration of C.O. Grzeskowiak, who stated that, at approximately 7:00 a.m. on the morning of May 12, 2019, he was conducting a weekly razor inspection in the C-16 gallery at Auburn C.F.  See Dkt. No. 19-9 at 1 ¶¶ 5-6.  C.O. Grzeskowiak explained that the weekly razor exchange involves corrections offers ordering inmates' produce their state-issued razors for inspection, so that correctional staff may account for all state-issued razors distributed to inmates and so that inmates may exchange their old razor for a new one if they choose.  See id. at 1-2 ¶ 7.  However, when an inmate fails to produce his razor, a cell search is conducted. See id. at 2 ¶ 7.  When C.O. Grzeskowiak instructed plaintiff to produce his razor for inspection on the morning of May 12, 2019, "[p]laintiff responded to [the] order . . . with a blank stare[,] attempted to hand [C.O. Grzeskowiak] a lighter[, and] appeared to be intoxicated."  Id. at 2 ¶ 8.  Plaintiff then failed to comply with "several more direct orders to provide his razor."  Id. at ¶ 9.  After completing the razor exchange for the rest of the area, C.O. Grzeskowiak notified the area supervisor "of [p]laintiff's behavior."  Id. at ¶ 10.

C.O. Grzeskowiak further stated that, "[a]t approximately 7:30 a.m., Sgt. Cordway, the area supervisor, authorized [him] to frisk [p]laintiff's cell to search for the missing razor."  Dkt. No. 19-9 at 2 ¶ 11.  Plaintiff exited the cell, where he remained during the cell frisk.  See id. at ¶ 12.  C.O. Grzeskowiak stated that C.O.s Sadowski and Skelly assisted him during the cell frisk, with C.O. Sadowski "maintain[ing] observation of [p]laintiff."  Id. at ¶ 14.  While conducting the cell frisk, C.O. Grzeskowiak explained, "[p]laintiff turned in an aggressive manner and attempted to strike C.O. Sadowski."  Id.

at ¶ 15.  C.O. Grzeskowiak "used lower body holds to assist [C.O.] Sadowski in bringing [p]laintiff to the ground [to] be handcuffed."  Id. at ¶ 16.  "Once on the ground," C.O. Skelly handcuffed plaintiff "and all force ended."  Id.  Following the incident, plaintiff was escorted out of the area by other officers and C.O. Grzeskowiak completed the cell frisk.  See id. at ¶¶ 17, 18.  Upon frisking plaintif's cell, C.O. Grzeskowiak stated that he "discovered [p]laintiff's razor in his locker" and "also discovered approximately 1 gallon of a possible alcohol/intoxicant."  Id.  C.O. Grzeskowiak notified Sgt. Cordway about the liquid.  Id. at ¶ 19.  C.O. Grzeskowiak further stated that, "[a]t no point did [he] witness [C.O.] Sadowski strike [p]laintiff in any way."  Id. at 3 ¶ 22.  C.O. Grzeskowiak issued plaintiff a misbehavior report as a result of this incident, charging plaintiff with the following violations of DOCCS rules: failure to follow a direct order (rule 106.10), loss/damage of state property (rule 116.10), and possession of alcohol/intoxicant (rule 113.13).  See id. at ¶ 20; Dkt. No. 19-3 at 29-30.

Further, defendants submit the declaration of C.O. Sadowski, who explained that he assisted C.O. Grzeskowiak in frisking plaintiff's cell on May 12, 2019, after plaintiff failed to produce his state-issued razor.  See Dkt. No. 19-13 at 2 ¶¶ 8-9.  Pursuant to protocol for cell frisks, C.O. Sadowski stated that "[p]laintiff was ordered to keep his hands in his pockets and face his cell to observe the cell frisk."  Id. at ¶ 11.  However, C.O. Sadowski stated that "[p]laintiff turned towards [him] several times, shouting 'what are you going to do,'" in response to which C.O. Sadowski "order[ed] him several times to face his cell."  Id. at ¶ 12.  C.O. Sadowski stated that "[p]laintiff appeared . . . to be intoxicated, and [that] his pants were soaked with what appeared to be urine."  Id. at ¶ 14.  Moreover, C.O. Sadowski explained that "[p]laintiff eventually turned in an

aggressive manner and attempted to strike [him] in the face with his right hand[,]" at which time "forced was used on [p]laintiff to gain compliance," including the use "of a body hold on plaintiff's upper body to force [him] to the ground." Id. at ¶¶ 14, 15.  C.O. Sadowski stated that, "[a]t no time did [he] ever strike [p]laintiff in any way, on any part of his body." Id. at 3 ¶ 18.

Defendants also proffer the declaration of C.O. Skelly who stated that he was "asked to stand by at the end of the company" during C.O. Grzeskowiak's May 12, 2019 cell frisk "in the event assistance was needed." Dkt. No. 19-17 at 2 ¶ 8.  C.O. Skelly explained that, while C.O. Grzeskowiak was performing the cell frisk, "[p]laintiff became argumentative and [that he] observed [p]laintiff attempt to strike [C.O. Sadowski with his right hand[,] at which time C.O. Skelly "approached [p]laintiff's cell to assist." Id. at ¶ 9. C.O. Skelly further explained that "force was used on [p]laintiff to gain compliance[,]" which consisted of "[C.O.s] Sadowski and Grzeskowiak us[e of] body holds to force [p]laintiff to the ground." Id. at ¶ 10.  Once plaintiff was on the ground, C.O. Skelly stated that he handcuffed plaintiff's hands behind his back, at which point plaintiff "became compliant." See id. at ¶ 12.  C.O. Skelly also observed that "[p]laintiff appeared to be under the influence of some form of intoxicant." Id.

Following the incident, C.O.s Grzeskowiak and Skelly completed use of force memoranda, which recounted the foregoing facts, including that the officers used body holds to subdue plaintiff after he attempted to strike C.O. Sadowski.  See Dkt. Nos. 19-12 at 1-2; Dkt. No. 19-18 at 1-2.  Further, defendants have submitted C.O. Sadowski's use of force memoranda in which he explained that, after plaintiff attempted to strike him in the face, he "grabbed [plaintiff] by the upper body and forced him to the ground

and maintained ahold of him until assisting staff placed mechanical wrist restraints on him." Dkt. No. 19-15 at 2. C.O. Sadowski also drafted a memorandum on June 6, 2019, to Sgt. McCarthy relating to his investigation of plaintiff's May 28, 2019 grievance (grievance #AUB-76216-19), in which he stated that "at no time did [he] assault [plaintiff]" and that "all forced used during th[e May 12, 2019] incident was necessary to gain compliance of an aggressive and combative inmate." Dkt. No. 19-16 at 1.

Moreover, defendants proffer the DOCCS use of force report, which states that, during the May 12, 2019 cell frisk, plaintiff appeared to be under the influence of an intoxicant and became aggressive, at which point C.O.s Sadowski, Grzeskowiak, and Skelly used body holds and applied mechanical restraints to gain compliance, and that plaintiff was transferred to SHU following the incident. See Dkt. No. 19-14 at 1-2. Defendants also submit Sgt. Cordway's memorandum dated May 12, 2019, concerning the liquid substance recovered by C.O. Grzeskowiak from plaintiff's cell in which he stated, "[b]ased upon my experience, and the circumstances under which the substance mentioned in the misbehavior report dated 5/12/19, was found, I believe that the substance is, or was intended to be homemade alcohol." Dkt. No. 19-3 at 32. In addition, defendants proffer Sgt. McCarthy's June 6, 2019 memorandum regarding his investigation of plaintiff's grievance (grievance #AUB-76216-19) in which he explained that he interviewed plaintiff who "had nothing further to add to [his grievance] and provided two witnesses," inmates Davis and Lewis. Dkt. No. 19-3 at 9. Sgt. McCarthy explained that Sgt. Cordway interviewed inmates Davis and Lewis, and that neither of those witnesses "want[ed] to provide a statement regarding [plaintiff's] grievance." Id. Sgt. Cordway's memorandum, dated June 13, 2019, to Captain Norris states that he

"interviewed both inmates separately[,]" and "explained to both [that] they were listed as witnesses by [plaintiff]." Id. at 10. Sgt. Cordway indicated that "[b]oth inmates declined to add any further information in regard to [plaintiff's] complaint." Id. Following a Tier III disciplinary hearing on June 15, 2019, plaintiff was found guilty of violations of possession of alcohol or intoxicant (rule 113.13) and refusing a direct order (rule 106.10), but not guilty of property damage or loss (116.10). See Dkt. No. 19-3 at 19.

### b. C.O. Torres

Defendants also controvert plaintiff's factual recitation with respect to the incident involving C.O. Torres. See Dkt. No. 19-28 at 22-23. In particular, defendants proffer the surveillance video footage of C.O. Torres' encounter with plaintiff on May 12, 2019, in the Auburn C.F. SHU, and contend that the video evidence "directly contradicts [p]laintiff's version of events" and entitles defendants to summary judgment dismissing plaintiff's excessive force claim against C.O. Torres. See Dkt. No. 19-28 at 22. Defendants also proffer C.O. Torres' declaration in which he describes the events of May 12, 2019, during his strip frisk of plaintiff in the Auburn C.F. SHU and refences the video footage. See Dkt. No. 19-19. C.O. Torres explained that, at approximately 7:49 a.m. on May 12, 2019, plaintiff was admitted to the Auburn C.F. SHU where he was working. See Dkt. No. 19-19 at 1 ¶¶ 5, 6. C.O. Torres stated that, "[a]ny inmate [is] admitted to the SHU must first undergo a strip frisk[,]" which "involves a search of the inmate's clothing and body, including a visual inspection of body cavities." Id. at 1-2 ¶¶ 7, 8. C.O. Torres noted that, "[u]pon admission, [p]laintiff was brought to SHU cell P-3 for strip frisk. During his escort to P-3, [p]laintiff "was yelling, swearing, and

threatening[,]" and "appeared to be under the influence of an unknown intoxicant."  Id. at

2 ¶ 9.  C.O. Torres notes that "[t]he entire incident inside cell P-3 [wa]s captured on

video" without audio.  Id. at ¶ 10.

C.O. Torres stated that, when he began the strip frisk, "[p]laintiff was angry and

belligerent but eventually complied with [C.O. Torres'] instructions to remove his

clothing and shoes."  Dkt. No. 19-19 at ¶ 11.  However, when C.O. Torres instructed

plaintiff to bend at his waist so that he could visually inspect his buttocks, C.O. Torres

"noticed an object in [plaintff's] buttocks area that appeared to be white and shiny."  Id.

at ¶ 12.  C.O. Torres stated that, at 3:59 of the video footage, he can be seen "leaning

over to [his] right and pointing to the unknown object[,]" and that, at 4:03, the officers

standing outside of cell P-3 entered the cell to assist him.  Id. at ¶ 13.  At 4:04 of the

video footage, C.O. Torres stated that "[p]laintiff reached for the unknown item(s) in his

buttocks."  Id. at ¶ 15.  Further, C.O. Torres stated, at 4:05, plaintiff failed to comply with

his direct order to "stop and drop the item[,]" and "appeared to bring the object(s) up

towards his mouth."  Id. at ¶ 16.  C.O. Torres explained that, "[i]n an attempt to gain

control of [p]laintiff and prevent him from swallowing the object he had just retrieved

from his buttocks, [he] put [p]laintiff in a body hold around his upper body" by "plac[ing]

[his] arms around [plaintiff's] arms in an attempt to prevent him from brining his hand up

towards his mouth."  Id. at 2-3 ¶ 17.  At 4:09 of the video, C.O. Torres explained that he

can be seen placing plaintiff in a body hold and "forc[ing] [p]laintiff to the floor in order to

gain control over [him,]" and that they "both went down to the ground."  Id. at 3 ¶ 17.

Once on the ground, "[p]laintiff struggled to get free and [C.O. Torres] held onto him

while other staff members attempted to gain control of [p]laintiff by using body holds on

his upper and lower body." Id. at ¶ 18.  C.O. Torres stated that "[p]laintiff was never

unconscious or put to sleep while he was on the ground." Id. at 3 ¶ 19.  Further, C.O.

Torres noted that, at 4:25, 4:49, and 5:09 of the video, plaintiff can be seen moving, and

that "[a]n officer grabs his leg in order to bring [him] under control." Id.  After plaintiff

was brought under control, he was escorted away from the area and examined by

medical staff.  See id. at ¶ 20.

Defendants also proffer C.O. Torres' misbehavior report, which charged plaintiff

with violating DOCCS rules by creating a disturbance (rule 104.13), failing to comply

with a direct order (rule 106.10), possessing contraband (rule 113.23), smuggling (rule

114.10), and failing to comply with frisk and search procedures (rule 115.10).  See Dkt.

No. 19-20 at 1.  C.O. Torres' misbehavior report relayed the same version of events

relating to the strip frisk as contained in his declaration, and added that, following the

incident, while plaintiff "was being escorted to contraband watch he kept yelling 'free

money' – 'yall aint gonna [sic] find shit-Im [sic] too smooth." Id. at 2.  Further,

defendants submit Sgt. McCarthy's use of force report dated May 12, 2019, see Dkt.

No. 19-4 at 10-11, and the use of force staff memoranda authored by C.O. Torres and

the correction officers who assisted him during plaintiff's strip frisk—nonparty C.O.s

Grennell, Sears, Delaney, Ray, Mitchell, and Lovejoy—which convey the same version

of events as stated by C.O. Torres.  See id. at 12-13, 14-15, 16-17, 18-19, 20-21, 22-23,

25-25.

Defendants contend that the video footage refutes plaintiff's allegation that C.O.

Torres "put [him] to sleep," as it shows his leg moving, which defendants aver

"indicat[es plaintiff] was fully conscious." Id. at 23.  Further, defendants aver, the video

footage and plaintiff's medical records are inconsistent with the allegations in his complaint and his deposition testimony.  See id. at 22.  In particular, defendants point to the portions of plaintiff's deposition testimony in which he stated that he "went to sleep" and/or was rendered unconscious by C.O. Torres while he was on the floor in the SHU cell, and did not "remember most of" the incident, that he "woke up in . . . the deprivation room," and that he was "unconscious from the time [he] hit the floor until [he was] in a . . . different room."  Dkt. No. 19-2 at 72, 73.  In particular, defendants note the portion of the video footage in which plaintiff walks out of the SHU cell, which they assert "shows that [p]laintiff was conscious after he was brought to his feet" and "walk[ed] out of the room under his own power after he ha[d] been handcuffed."  Id. at 23.

Defendants also proffer plaintiff's medical records from the day of the incident, which state that plaintiff was observed as having only a one-inch abrasion near his left eyebrow area with "no other injuries observed."  Dkt. No. 19-6 at 1; see Dkt. No. 19-4 at 7 (plaintiff's inmate injury report dated May 12, 2019, stating the same).  Defendants also point to plaintiff's sick call notes from June 7, 2019, in which plaintiff complained of "neck pain since 5/12/19 when says [sic] he was choked by CO."  Id. at 6.  However, defendants note that plaintiff also stated that "[h]e d[id] not know if he had LOC [loss of consciousness], but was not hospitalized" as a result of his encounter with C.O. Torres, which they contend evidences inconsistency with his allegations concerning C.O. Torres using a chokehold to render him unconscious.  Id. at 6.

In the alternative, defendants urge that, even without the video evidence, plaintiff's excessive force claim against C.O. Torres should be dismissed because plaintiff has alleged only de minimis force that did not result in a sufficiently serious

injury to rise to the level of an Eighth Amendment violation.  See Dkt. No. 19-28 at 25.

Defendants reiterate that plaintiff's medical records from May 12, 2019, indicate that he

suffered only a one-inch abrasion near his right cheek, and that his medical evaluation

from May 13, 2019, indicated that plaintiff had "no medical complaints."  Dkt. No. 19-2 at

2.  Defendants also note the portion of plaintiff's deposition testimony in which he stated

that the neck pain allegedly caused by C.O. Torres' actions was "just like a little bit" from

"time to time."  Dkt. No. 19-2 at 78.  In addition, defendants submitted six photographs

of plaintiff wearing only his underwear that were taken on May 12, 2019, the first of

which contains a sign indicating that the photographs were taken by ("PTB") C.O.

Lovejoy.  See Dkt. No. 19-7 at 1.  The last photograph in this series consists of a close

shot of plaintiff's right upper cheekbone area, which appears to be slightly swollen.  See

id. at 6.


### 3. Qualified Immunity

Defendants argue that C.O.s Skelly and Grzeskowiak are entitled to qualified

immunity as to plaintiff's Eighth Amendment failure to intervene claims.  See Dkt. No.

19-28 at 28.  Defendants reason that "officers of reasonable competence could disagree

on the legality of [C.O. Skelly's and C.O. Grzeskowiak's] action in failing to intervene" to

prevent C.O. Sadowski's alleged action of striking plaintiff in the face where such

purported conduct was "unexpected" and plaintiff "was not even entirely sure as to

where the other officers were at the time of the strike."  Dkt. No. 19-28 at 28 (internal

quotation marks omitted).  Further, defendants contend that "it is not clearly established

that the force used by [C.O.] Torres was excessive."  Id.  In particular, defendants argue

that "reasonable officers could believe that [C.O.] Torres' actions" of wrapping his arms around plaintiff's upper body after plaintiff placed the object from his buttocks into his mouth in an attempt to prevent plaintiff from swallowing potential contraband "were necessary under the circumstances presented to him." Id. at 29.

## B. Plaintiff's Opposition to Defendants' Motion

### 1. Exhaustion of Administrative Remedies

In opposition to plaintiff's motion for summary judgment, plaintiff first argues that he filed the Complaint in the present action while his grievances "were still pending because [he] did not believe either of those grievances ever reached the grievance office for filing—hence, 2 identical grievances." Dkt. No. 24 at 2. Plaintiff posits that "defendants were aware that [he] intended to eventually pursue litigation, and so the SHU officers who collected mail were informing [him] that his mail was being destroyed." Id. at 2-3. Plaintiff avers that, "when [he] never received any acknowledgements with assigned grievance numbers from the grievance office, as the same officers were in control of in[]coming mail as well and [he] was not receiving any of his mail," he became "frustrated." Id. at 3. Plaintiff states that, "in utter desperation, believing that the officers were following through with their threats to interfere with grievances/mail, plaintiff figured it was best to just go ahead and file suit before all was lost." Id. at 3-4. Thus, plaintiff argues, he was "'thwarted'" from exhausting litigation by defendants' threats. Id. at 4 (citing Ross,136 S. Ct. at 1862).

### 2. Eighth Amendment Claims

Plaintiff argues that "a group of officers" "persecuted" him because they "assumed that he was a gang member," and that his failure to produce his razor on May 12, 2019, "was just an opportunity to capitalize on for defendants [sic] and they took full advantage of it, fishing for gang information and making snide, hostile, presumptuous anti-gang comments." Dkt. No. 24 at 5. Plaintiff posits that defendants sought to "provoke" him, but that when he "did not respond as expected," they "became frustrated, and without provocation or any genuine penological/security [sic] justifiable reason, [C.O.] Sadowski spontaneously assaulted [him]." Id. at 6. Plaintiff states that "the other officers further escalated it all the way to SHU." Id. "During the SHU strip frisk," plaintiff posits, apparently referring to C.O. Torres, "they also used an opportunity to do physical harm to plaintiff, manufacturing a [illegible] contraband retrieval story to justify the SHU portion of the assault." Id.

Plaintiff avers that defendants' conduct "of May 12, 2019[,] should qualify as wanton infliction of pain . . . and satisfy the first prong of the unconstitutional excessive force test." Dkt. No. 24 at 7. He posits that he "suffers post[-]traumatic stress symptoms as a direct result of the May 12, 2019 excessive force incidents significant enough that he is now maintained on 2 psychiatric medications," but states that he is "not able to provide documentation since the defendants never supplied the mental health records they were supposed to in discovery." Id. at 9-10. He also argues that C.O. Torres' use of force was not *de minimis*, as it rendered him "unconscious by obstructing blood flow and oxygen to the brain" and, therefore, "constitutes injury significant enough to satisfy" the objective prong. Id. at 8. Finally, plaintiff contends that defendants are not entitled to qualified immunity because their conduct of "persecuting,

then assaulting plaintiff for sport" "is so elementarily wrong" that "certainly no person could have believed it was acceptable." Id. at 10-11.

## C. Defendants' Reply

### 1. Exhaustion of Administrative Remedies

Defendants contend that plaintiff has failed to respond to their statement of material facts, despite twice being advised of the consequences of failing to properly respond to their motion for summary judgment. See Dkt. No. 25 at 5. Therefore, defendants request that the Court deem the allegations asserted in their statement of material facts as being admitted. See id. Further, defendants aver that plaintiff's argument that he was thwarted from exhausting his administrative remedies based on purported threats made by SHU officers is unpersuasive. See id. at 8. Defendants point to plaintiff's deposition testimony in which he testified that he "receive[d] a response to [his] grievance," and that he "appealed" the Superintendent's decision to CORC "the same day" he received the Superintendent's decision. Dkt. No. 19-2 at 96, 97. Moreover, defendants proffer a memorandum authored by Sgt. McCarthy at Auburn C.F., which states that, on June 6, 2019, he interviewed plaintiff concerning his May 28, 2019 grievance (Grievance # AUB-76216-19). See Dkt. No. 19-3 at 9. Thus, defendants posit, "[i]f [p]laintiff had been unclear up to that point as to whether his grievances had been received, [he] was clearly on notice that his grievances had been received at [the] time" of Sgt. McCarthy's interview. Dkt. No. 25 at 9. Moreover, defendants posit, had plaintiff been concerned as to whether his grievances were received, he could have sent letter inquiries to Auburn's IGP office. See id. In any

17

event, defendants argue, even if plaintiff had not received responses to his grievances, he would still have been required to take an appeal.  See id.

### 2. Eighth Amendment Claims

Defendants argue that, plaintiff's assertions—made for the first time in opposition to defendants' motion for summary judgment—that a "group of officers" "persecuted him" because they assumed he was in a gang are inconsistent with plaintiff's deposition testimony in which he specifically stated that he never had any issues with C.O.s Grzeskowiak, Skelly, or Sadowski prior to May 12, 2019.  Dkt. No. 25 at 10 (quoting Dkt. No. 24 at 5); see Dkt. No. 19-2 at 21-23.  Defendants further posit that plaintiff has failed to respond to their contention that the use of force involved in the first of the May 12, 2019 incidents constituted only *de minimis* force and has not responded to defendants' arguments concerning his failure to intervene claims; therefore, defendants argue, they are entitled to a lessened burden of proof as to those claims, which, they posit, they have met.  See id. at 11-12.  Further, defendants reassert that the surveillance video footage contradicts plaintiff's allegations and establishes defendants' entitlement to summary judgment dismissing plaintiff's excessive force claim asserted against C.O. Torres.  See id. at 13.  Moreover, defendants dispute plaintiff's claim—raised for the first time in opposition to the motion for summary judgment—that he suffers from post-traumatic stress disorder ("PTSD") as a result of the May 12, 2015 incidents.  See id. at 14.  Defendants argue that, "according to [plaintiff's] records from the New York State Office of Mental Health, no such diagnosis . . . exists."  Id.  In any event, defendants argue, plaintiff's medical records establish only that, "[i]n November 2019, he was

placed on Zoloft© based on his own request to 'restart' taking it, as he had taken it in the past." Id. (quoting Dkt. No. 27 at 22).  Finally, defendants incorporate by reference their arguments concerning qualified immunity as stated in their memorandum of law in support of their motion for summary judgment.  See id.

### III. Legal Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  The moving party has the burden of showing the absence of a genuine dispute of material fact by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion.  Celotex, 477 U.S. at 322; see FED. R. CIV. P. 56(c).  A fact is material if it "might affect the outcome of the suit," as determined by the governing substantive law; a "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial."  Id. at 248, 250; see Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences

against the movant." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986) (citing Quarles v. Gen. Motors Corp. (Motors Holding Div.), 758 F.2d 839, 840 (2d Cir. 1985) (per curium)). Furthermore, "mere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (brackets omitted) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Treistman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a *pro se* litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not consistent with the *pro se* litigant's allegations, or arguments that the submissions themselves do not suggest, that we should not excuse frivolous or vexatious filings by *pro se* litigants, and that *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law . . . .

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds *pro se*, . . . a

court is obligated to construe his pleadings liberally." (internal quotation marks and citations omitted)).

## IV. Analysis[3]

### A. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration.  See 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.").  The exhaustion requirement applies "'to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.'"  Cucchiara v. Dumont, No. 9:18-CV-0182 (GLS/CFH), 2019 WL 2516605, at *4 (N.D.N.Y. Apr. 26, 2019) (quoting Porter v. Nussle, 534 U.S. 516, 532 (2002)).  Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as money damages.  See Porter, 534 U.S. at 524.  "To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated." Cuadrado v. Brueault, No. 9:14-CV-1293 (DNH/CFH), 2015 WL 1606178, at *3 (N.D.N.Y. Apr. 8, 2015); see Jones v. Bock, 549 U.S. 199, 218 (2007).

---

[3]  All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (internal quotation marks and citation omitted). Until recently, courts in this District followed a three-part test established by the Second Circuit in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004). Under the test established in Hemphill, a plaintiff's failure to exhaust could be excused if a plaintiff established that his or her failure to exhaust was justified by "special circumstances." Id. However, in Ross v. Blake, the Supreme Court held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, _____ U.S. _____ 136 S. Ct. 1850, 1862 (2016). Thus, the special circumstances exception previously promulgated by the Second Circuit in Hemphill is no longer consistent with the statutory requirements of the PLRA. See Williams v. Correction Officer Priatno, 829 F.3d 118, 123 (2d Cir. 2016).

However, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, _____ U.S. _____, 136 S. Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001)). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are

unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

There is no genuine dispute that, at all relevant times, Auburn C.F. had in place a well-established three-step administrative procedure for inmate grievances known as the IGP, see Dkt. Nos. 19-24 at 3 ¶ 11, and that plaintiff was familiar with that process. See Dkt. No. 19-2 at 97; see also N.Y. COMP. CODES R. & REGS. (7 N.Y.C.R.R.) § 701.5. First, an inmate must file a grievance with IGRC. See 7 NYCRR § 701.5(a)(1)-(b). An adverse decision from IGRC is to be appealed to the superintendent of the facility, and an adverse decision of the superintendent must be appealed to CORC. See id. at § 701.5(c), (d). "Grievances claiming employee harassment, including claims of excessive force, "are of particular concern to the administration of [DOCCS] facilities," and subject to an expedited procedure whereby the grievance goes directly to the facility superintendent. Hamlet v. Stotler, No. 9:17-CV-0939 (GLS/TWD), 2018 WL 2729263, at *5 (N.D.N.Y. Apr. 27, 2018) (quoting 7 N.Y.C.R.R. § 701.8), report and recommendation adopted sub nom. Hamlett v. Stotler, No. 9:17-CV-939 (GLS/TWD), 2018 WL 2727875 (N.D.N.Y. June 6, 2018). The superintendent is required to initiate an in-house investigation by higher ranking supervisory personnel; request an investigation by the inspector general's office; or request an investigation by the New York State Police Bureau of Investigation if the superintendent determines that criminal activity may be involved. See 7 N.Y.C.R.R. § 701.8(d). "Within 25 calendar days of receipt of the grievance, the superintendent will render a decision on the grievance and transmit said decision, with reasons stated to the grievant." Id. at § 701.8(f). The inmate must then appeal an adverse decision to CORC within seven calendar days of

receipt of the Supervisor's decision.  See id. at § 701.8(h).  Regardless of whether the grievance is related to an assault, an appeal is not exhausted until the inmate receives a final decision from CORC.  See Hamlet, 2018 WL 2729263, at *5.  "The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action."  McMillian v. Walters, No. 9:16-CV-0277 (MAD/DJS), 2017 WL 8894737, at *2 (N.D.N.Y. Dec. 18, 2017), report and recommendation adopted, No. 9:16-CV-277 (MAD/DJS), 2018 WL 879270 (N.D.N.Y. Feb. 14, 2018).

### 1. Plaintiff Failed to Exhaust his Administrative Remedies

Defendants have met their burden of establishing that no genuine issue of material fact exists concerning plaintiff's failure to exhaust his administrative remedies prior to commencement of the present action.  It is well settled that "a prisoner may not file suit . . . before the time in which CORC is supposed to issue a decision has expired."  Animashaun v. Afify, 470 F. Supp. 3d 294, 296 (W.D.N.Y. 2020); see Bowie v. Woodruff, No. 9:18-CV-0266 (BKS/ML), 2019 WL 7606078, at *5 (N.D.N.Y. Sept. 20, 2019) (holding that the pro se inmate failed to "fully exhaust his administrative remedies prior to filing [his] lawsuit," where CORC did not decide the plaintiff's administrative appeal until "approximately eight months after [he] commenced [his federal] action."), report and recommendation adopted, No. 9:18-CV-00266 (BKS/ML), 2019 WL 5445519 (N.D.N.Y. Oct. 23, 2019); Feliz v. Johnson, No. 9:17-CV-1294 (DNH/ATB), 2019 WL 3491232, at *2 (N.D.N.Y. Aug. 1, 2019) (holding that the pro se inmate "did not fully exhaust his administrative remedies prior to commencing this action because he filed

his federal complaint before completing the DOCCS grievance process," where the "plaintiff had not yet even appealed the relevant grievance to CORC at the time of filing this action."); see also White v. Drake, No. 10-CV-1034 (GTS/DRH), 2011 WL 4478988, at *3 (N.D.N.Y. Aug. 11, 2011) ("Included within the IGP's exhaustion requirement is the prerequisite that the inmate file an appeal with CORC and receive a response from CORC prior to filing a federal lawsuit." (citations omitted)), report and recommendation adopted, No. 9:10-CV-1034 (GTS/DRH), 2011 WL 4478921 (N.D.N.Y. Sept. 26, 2011).

Here, it is undisputed that plaintiff filed his Complaint on June 12, 2019—only 7 days after filing his second grievance on June 5, 2019—which plaintiff acknowledges was "identical" to his May 28, 2019 grievance that he filed only 15 days prior to filing his Complaint. Dkt. No. 24 at 2; see Compl. at 1 (entered June 12, 2019); Dkt. No. 19-25 at 1. As defendants posit, plaintiff filed his federal Complaint during the pendency of the 25-calendar-day period between receipt of his grievances and the time in which the Superintendent of Auburn was required to render a decision pursuant to 7 N.Y.C.R.R. § 701.8(f). See Dkt. No. 19-28 at 10. Further, as Seguin explained, the Superintendent at Auburn denied plaintiff's grievances on July 3, 2019, and plaintiff filed appeals to CORC on July 12, 2019, which were "received and processed by the IGRC office at Auburn on July 31, 2019"— after plaintiff had already commenced the present action. Dkt. No. 19-24 at 4 ¶¶ 14, 15; Dkt. No. 19-26 at 1 (Auburn C.F. Case History and Record Cover Sheet for plaintiff's May 28, 2019 grievance, listing the "superintendent date" as "7/3/19" and the "Appeal Date" as "7/31/19." (capitalization omitted)). Thus, plaintiff failed to exhaust his administrative remedies by filing his Complaint before he appealed the Superintendent's decision to CORC. See id.; Dkt. No. 19-25; Compl. at 1;

25

Animashaun, 470 F. Supp. 3d at 296; Bowie, 2019 WL 7606078, at *5;  Feliz, 2019 WL 3491232, at *2; White, 2011 WL 4478988, at *3.[4]

Moreover, although it is not apparent from the record whether or when CORC issued a decision on plaintiff's appeals, courts routinely dismiss claims for failure to exhaust administrative remedies under the PLRA even where CORC issues a decision after the plaintiff filed a federal complaint.  See, e.g., Scott v. Uhler, No. 9:16-CV-403 (TJM/CFH), 2019 WL 5197139, at *5 (N.D.N.Y. July 31, 2019) ("Receiving a decision from CORC after filing a federal lawsuit does not satisfy the PLRA's requirement that administrative remedies be exhausted before filing suit, and any such action must be dismissed . . . ." (citation omitted)), report and recommendation adopted, No. 9:16-CV-403 (TJM/CFH), 2019 WL 4667495 (N.D.N.Y. Sept. 25, 2019).  As the foregoing establishes, plaintiff failed to exhaust his administrative remedies before commencing the present action.

### 2. Availability of Administrative Remedies

As an initial matter, plaintiff's vague and conclusory assertions that he was "frustrated" because he believed Auburn SHU officers were tampering with his grievances, so he "figured it was best to just go ahead and file suit before all was lost," did not relieve him from his obligation of complying with the exhaustion requirement.

---

[4]  "Courts within this Circuit are split as to whether a delay by CORC constitutes unavailability that would excuse a plaintiff's failure to exhaust his administrative remedies."  Lovell v. McAuliffe, No. 9:18-CV-0685 (TJM/CFH), 2019 WL 4143361, at *6 (N.D.N.Y. May 1, 2019), report and recommendation adopted, No. 9:18-CV-0685 (TJM/CFH), 2019 WL 4142593 (N.D.N.Y. Aug. 30, 2019); see Houston v. Coveny, No. 14-CV-6609 (FPG), 2020 WL 2494439, at *3 (W.D.N.Y. May 14, 2020).  However, the undersigned need not reach that issue here, as there had been no delay by CORC at the time plaintiff brought this action and plaintiff filed his Complaint before having even filed his administrative appeal to CORC.  See Compl. at 1; Dkt. No. 19-25 at 1; Dkt. No. 19-26 at 1.

Dkt. No. 24 at 3-4; see Animashaun, 470 F. Supp. 3d at 296 (holding that the plaintiff's "bare allegation" that DOCCS personnel told him to "ignore the prison regulation on administrative exhaustion and instead to go ahead and file the complaint" without receiving a decision from CORC was "not enough to excuse the exhaustion requirement.").

Further, defendants point to admissible documentary evidence, namely Sgt. McCarthy's memorandum regarding his interview of plaintiff on June 6, 2019 concerning the May 28, 2019 grievance—which occurred only eight days after that grievance was filed—and only one day after plaintiff's second grievance was filed with the Auburn IGP office.  See Dkt. No. 19-3 at 9.  As defendants correctly observe in their reply to plaintiff's opposition, had plaintiff been unsure as to the status of his grievances, Sgt. McCarthy's interview would have placed him on notice—by June 6, 2019, at the latest— that at least one of his two identical grievances had been received and was being investigated.  See id.; see also Dkt. No. 25 at 9.  Moreover, insofar as plaintiff's opposition may be liberally construed as contending that he filed his Complaint because the Superintendent's response to his grievance came late on July 3, 2010— approximately 10 days after the end of the 25-calendar-day time period from the date of receipt of the grievance under 7 N.Y.C.R.R. § 701.8(f)—his argument is unpersuasive. See Dkt. No. 24 at 2-4.  As explained above, plaintiff filed his Complaint during the 25-calendar-day period from the dates he filed his grievances.  See Dkt. No. 19-25 at 1; Compl. at 1.  Thus, the undersigned concludes that defendants have established, through admissible documentary evidence, that administrative remedies were available to plaintiff with respect to his claims in this action, in opposition to which plaintiff has

failed to raise a material issue of fact through his conclusory assertions to the contrary, made for the first time in opposition to defendants' motion for summary judgment.  See Batista v. Union of Needleworkers, No. 97-CV-4247 (HB), 2000 WL 1760923, at *3 (S.D.N.Y. Nov. 30, 2000) (holding that the plaintiff's "conclusory statements" offered "in response to [the] defendant's evidence" were "insufficient as a matter of law to raise an issue of fact."); see also Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case.").

"Ordinarily, the proper remedy where a prisoner has failed to satisfy the exhaustion requirement is to dismiss the complaint without prejudice, to give the inmate a chance to exhaust his administrative remedies and then refile his complaint."  Bennett v. Columbe, No. 9:16-CV-653 (BKS/CFH), 2018 WL 5728042, at *5 (N.D.N.Y. July 17, 2018) (internal quotation marks and citation omitted), report and recommendation adopted, No. 9:16-CV-0653 (BKS/CFH), 2018 WL 4627663 (N.D.N.Y. Sept. 27, 2018). However, for the reasons discussed below, because the undersigned concludes that defendants are entitled to summary judgment on the merits, it is recommended that plaintiff's complaint be dismissed with prejudice.

### B. Eighth Amendment Claims

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983.  Hudson v. McMillian, 503 U.S. 1, 9-10 (1992).  The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain."  Sims v.

Artuz, 230 F.3d 14, 20 (2d Cir. 2000) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)).

### 1. Excessive Force: C.O. Sadowski

To establish an Eighth Amendment excessive force claim, a plaintiff must satisfy both objective and subjective elements.  See Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999).  The objective element is "responsive to contemporary standards of decency" and requires a showing "that the injury actually inflicted [is] sufficiently serious to warrant Eighth Amendment protection."  Hudson, 503 U.S. at 8 (internal quotation marks and citation omitted); Blyden, 186 F.3d at 262.  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."  Sims, 230 F.3d at 22 (internal quotation marks, alteration, and citation omitted).  However, "the malicious use of force to cause harm[] constitute[s] [an] Eighth Amendment violation *per se*" regardless of the seriousness of the injuries. Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9).  "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."  Hudson, 503 U.S. at 9-10 (internal quotation marks and citations omitted).  "The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it."  Id. at 7.

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness."  Sims, 230 F.3d at 21 (internal quotation marks and citations omitted).  Thus, the key inquiry into a claim of

excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically [to] cause[] harm." Hudson, 503 U.S. at 7 (internal quotation marks and citations omitted); see also Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (per curiam) (Observing that the Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases—"not whether a certain quantum of injury was sustained.") (internal quotation marks and citation omitted).  In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider:

> the extent of the injury and the mental state of the defendant[;] . . . the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response

Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

Here, defendants have established entitlement to summary judgment dismissing plaintiff's Eighth Amendment excessive force claim against C.O. Sadowski.  See Compl. at 4.  Even viewing the evidence in the light most favorable to plaintiff as the nonmoving party, the documentary evidence establishes that, at most, C.O. Sadowski used *de minimis* force by allegedly "striking [plaintiff] on the right side of [his] face for no reason which lead to these officer's [sic] using excessive force violating [his] 8th Amendment [sic]."  Id.; see Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir.1997) (holding that inmate's "allegations of excessive force—that he was bumped, grabbed, elbowed, and pushed by [the defendant correction officers]—do not approach an Eighth Amendment claim.  The force [the plaintiff] describes is not sufficiently serious or harmful to reach

constitutional dimensions); <u>Mayo v. Lavis</u>, No. 11-CV-869, 2016 WL 2756545, at *7 (W.D.N.Y. May 12, 2016) (holding that, "even if [the plaintiff] properly exhausted his administrative remedies, his Eighth Amendment claim would fail because even assuming that [the defendant] pushed [the plaintiff] onto the bench, punched him in the face, and threw him on the floor, the force used was *de minimis* under the caselaw.");

As defendants argue in reply to plaintiff's opposition, <u>see</u> Dkt. No. 25 at 11-12, plaintiff does not dispute their contention that C.O. Sadowski's use of force was *de minimis*. <u>See</u> Dkt. No. 24 at 4-6. Indeed, plaintiff's response in opposition contends only that C.O. Torres' alleged chokehold constituted more than *de minimis* force—but does not address defendants' arguments concerning C.O. Sandowski other than reasserting, conclusorily, that C.O. Sandowski "spontaneously assaulted" him. Dkt. No. 24 at 6. Further, a careful examination of the parties' arguments and evidence reveals that plaintiff does not allege that he sustained any injurie from C.O. Sadowski's alleged use of force. <u>See</u> Compl. at 4; Dkt. No. 24 at 6. Indeed, the only injuries and/or physical pain that plaintiff alleges, or that his medical records support, are a one-inch abrasion on his right cheek and reported neck pain, that were, by plaintiff's own admission, the result of his encounter with C.O. Torres and the assisting correction officers in SHU—not his contact with C.O. Sadowski. <u>See</u> Compl. at 4; Dkt. No. 19-6 at 1, 6; Dkt. No. 19-4 at 7. The absence of injury or pain indicates that the force alleged was insufficient to sustain a claim for excessive force under the Eighth Amendment. <u>See</u> <u>Boddie</u>, 105 F.3d at 862 (granting summary judgment in favor of the defendant correction officers as to the <u>pro se</u> inmate plaintiff's Eighth Amendment excessive force claim where the plaintiff did "not maintain that he experienced any pain or injury as a

result of the physical contact.").  Moreover, even assuming plaintiff attributed the

abrasion on his right check to C.O. Sandowski, such injury is *de minimis* and insufficient

to sustain an Eighth Amendment excessive force claim.[5]  See Bermudez v. Waugh, No.

9:11-CV-0947 (MAD/DEP), 2013 WL 654401, at *5 (N.D.N.Y. Feb. 21, 2013) (holding

that the plaintiff's allegations that the defendant correction officer ran towards him and

punched him in the chest resulting a "little red mark" or "red bruise" that was "a couple

centimeters across" was a "*de minimis* use of force . . . [that wa]s clearly insufficient to

satisfy the objective prong of an excessive force claim."); James v. Phillips, No. 05 Civ.

1539, 2008 WL 1700125, *4-5 (S.D.N.Y. Apr. 9, 2008) (finding *de minimis* use of force

when prison guard shoved inmate into door which resulted in temporary swelling of the

inmate's chin).  Thus, plaintiff has failed to establish the objective prong for a claim of

excessive force against C.O. Sadowski.

   In addition, aside from plaintiff's conclusory statements that C.O. Sadowski

"maliciously" assaulted him "without provocation or any genuine penological/security

justifiable reason," see Compl. at  Dkt. No. 24 at 6, the record is devoid of evidence

indicating that C.O. Sadowski used force against plaintiff "maliciously and sadistically

[to] cause[] harm."  Hudson, 503 U.S. at 7 (internal quotation marks and citations

omitted).  Rather, defendants' admissible evidence establishes, at most, that C.O.

Sadowski, C.O. Grzeskowiak, and C.O. Skelly used *de minimis* force "in a good-faith

effort to maintain or restore discipline" after plaintiff failed to comply with C.O.

Grzeskowiak's direct order to produce his razor and then "turned in an aggressive

manner and attempted to strike C.O. Sadowski" during the ensuing cell frisk.  Id.

---

[5] There are simply no facts upon which the undersigned can plausibly infer that plaintiff attributes his
alleged neck pain to C.O. Sadowski.  See Compl. at 4; Dkt. No. 24 at 6.

(internal quotation marks and citations omitted); see Dkt. No. 19-2 at 2 ¶ 15; Dkt. Nos. 19-12 at 2; Dkt. No. 19-18 at 2.  Plaintiff's conclusory assertions to the contrary are insufficient to raise a genuine issue of material fact.  See Scott, 344 F.3d at 287; Batista, 2000 WL 1760923, at *3; see also Zembko v. Northwestern Mut. Life Ins. Co., No. 3:05-CV-918 (AHN), 2007 WL 948323, at *4 n.1 (D. Conn. Mar. 26, 2007) ("[A] nonmovant's self-serving conclusory statements that dispute the movant's evidence cannot create material issues of fact to avoid summary judgment." (internal quotation marks and citation omitted)).  Accordingly, as plaintiff has failed to establish the either prong for an Eighth Amendment excessive force claim against C.O. Sadowski, it is recommended that this claim be dismissed with prejudice.

### 2. Failure to Protect: C.O. Grzeskowiak and C.O. Skelly

Correction officers may be held liable under Section 1983 for failing to intervene where another correction officer is violating an inmate's constitutional rights.  See Tafari v. McCarthy, 714 F. Supp. 2d 317, 342 (N.D.N.Y. 2010).  To establish a claim for failure to protect, a plaintiff must demonstrate that "'(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene.'"  Id. (quoting Jean-Laurent v. Wilkinson, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008), aff'd sub nom. Jean-Laurent v. Wilkerson, 461 F. App'x 18 (2d Cir. 2012) (summary order)).  "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an

issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994).

As an initial matter, plaintiff's failure to intervene claim against C. O. Grzeskowiak and C.O. Skelly is premised on his claim of excessive force against C.O. Sadowski. See Compl. at 4. Therefore, for the reasons discussed above, because plaintiff's excessive force claim against C.O. Sadowski fails, so to must his failure to intervene claim asserted against C. O. Grzeskowiak and C.O. Skelly based thereon. See Lewis v. Mollette, 752 F. Supp. 2d 233, 244 (N.D.N.Y. 2010) ("In order to establish liability on the part of a defendant under a failure to intervene theory, a plaintiff must prove the use of excessive force by someone other than the individual."); see also Walker v. City of New York, No. 11-CV-00314 (CBA/JMA), 2014 WL 12652345, at *12 (E.D.N.Y. Sept. 3, 2014) ("To prevail on a failure to intervene claim a plaintiff must demonstrate the existence of an underlying constitutional violation in which the defendant officer failed to intervene."), aff'd, 638 F. App'x 29 (2d Cir. 2016) (summary order).

In any event, even assuming plaintiff established that C.O. Sadowski used excessive force, his failure to intervene claim would still fail because, accepting plaintiff's factual allegations as true, C.O. Sadowski's alleged act of "striking" him occurred "spontaneously," Dkt. No. 24 at 6, and was "unexpected," Dkt. No. 19-2 at 50; therefore, C.O. Sadowski's act was of such a "brief and unexpected nature" that C.O. Grzeskowiak and C.O. Skelly "lacked reasonable opportunity to stop the alleged violation." Tafari, 714 F. Supp. 2d at 342; see Cusamano v. Sobek, 604 F. Supp. 2d 416, 429 n. 9 (N.D.N.Y.2009) (explaining that, "an officer is excused from liability, despite his presence, if the assault is sudden and brief, such that there is no real

34

opportunity to prevent it." (internal quotation marks and citation omitted)).  Thus, even accepting plaintiff's allegations as true, upon a thorough consideration of all the evidence, the undersigned concludes that no reasonable juror could possibly conclude that C.O. Grzeskowiak and C.O. Skelly had a real opportunity to intervene or prevent C.O. Sadowski's purported conduct.  See Anderson, 17 F.3d  557.  Consequently, it is recommended that plaintiff's Eighth Amendment failure to intervene claim against C. O. Grzeskowiak and C.O. Skelly be dismissed with prejudice.


### 3. C.O. Torres

There is no dispute that C.O. Torres and nonparty C.O.s Grennell, Sears, Delaney, Ray, Mitchell, and Lovejoy applied force to plaintiff during the course of the May 12, 2019 strip frisk.  C.O. Torres contends that he used only the amount of force necessary to gain control over and prevent plaintiff from swallowing contraband after plaintiff failed to comply with his direct order not to place the item(s) he removed from his buttocks into his mouth.  See Dkt. No. 19-19 at 2-3 ¶¶ 16-17.  Plaintiff contends that C.O. Torres unjustifiably placed him in a "rear naked chokehold" and rendered him unconscious.  Compl. at 4.[6]

To resolve the disparity between plaintiff's and defendants' accounts of C.O. Torres' May 12, 2019 use of force, the undersigned has carefully reviewed the surveillance video footage, which shows the entirety of the approximately 14 minutes

---

[6]  The undersigned notes that plaintiff did controvert defendants' argument that C.O. Torres' use of force was *de minimis* in his opposition in response to defendants' motion for summary judgment.  See Dkt. No. 24 at 8.  Therefore, contrary to defendants' contention, defendants are not entitled to a lesser burden of proof as to this claim.  See Dkt. No. 25 at 11-12.  However, as discussed herein, the undersigned concludes that defendants have met their burden of proof on summary judgment with respect to plaintiff's Eighth Amendment excessive force claim against C.O. Torres.

that plaintiff was strip frisked by C.O. Torres and other nonparty C.O.s in the Auburn

C.F. SHU.[7]  "When appropriate, the court may rely on such video evidence to determine

whether defendants are entitled to summary judgment."  Benitez v. Healy, No. 9:15-CV-

1179 (GLS/ATB), 2017 WL 9673721, at *5 (N.D.N.Y. June 7, 2017), report and

recommendation adopted, No. 9:15-CV-1179 (GLS/ATB), 2018 WL 1444218 (N.D.N.Y.

Mar. 22, 2018); see Scott v. Harris, 550 U.S. 372, 380 (2007) (holding that video

evidence can properly be considered on summary judgment and may be credited over a

non-movant's account if the video "blatantly contradict[s]" the non-movant's version of

events); Green v. Morse, No. 00-CV-6533 (CJS), 2009 WL 1401642, at *9 (W.D.N.Y.

May 18, 2009) (holding that the court may rely on video evidence clearly showing that

some use of force was necessary to grant summary judgment and dismiss a plaintiff's

excessive force claim).  Upon careful review of the Video Footage and defendants'

supporting documentary evidence, the undersigned concludes that defendants have

established entitlement to summary judgment as to plaintiff's Eighth Amendment

excessive force claim against C.O. Torres.

Notwithstanding the lack of audio, the Video Footage corroborates the

defendants' version of C.O. Torres' May 12, 2019 use of force.  First, as C.O. Torres

explained in his declaration, the video footage shows that, during the strip frisk, C.O.

Torres verbally ordered plaintiff to remove his underwear and bend at the waste.  See

Dkt. No. 19-19 at 2 ¶ 12; Video Footage at 3:58.  Once plaintiff is bent over, C.O. Torres

can be seen leaning to his right side, pointing at plaintiff.  See id. at ¶ 13; Video Footage

---

[7]  The surveillance video footage from the Auburn SHU cell in which plaintiff's interaction with C.O. Torres and nonparty C.O.s Grennell, Sears, Delaney, Ray, Mitchell, and Lovejoy is on file with the Clerk's Office. See Dkt. No. 21. Citations made thereto are designated "Video Footage," and the corresponding numbers reference the time from the beginning of the video recording.

at 3:59-4:01.  Further, the Video Footage at 4:02-4:04 corroborates C.O. Torres'

declaration in which he stated that plaintiff removed an object from his buttocks area

with his left hand.  See id. at ¶ 15; Video Footage at 4:02.  Moreover, 4:05 of the Video

Footage corroborates C.O. Torres' declaration, as it shows C.O. Torres give plaintiff

another verbal order and move closer to plaintiff while other correction officers enter the

strip frisk room, after which plaintiff can be seen turning to face his back towards C.O.

Torres and the other officers and moving his left hand up to his mouth.  See id. at ¶ 16;

Video Footage at 4:05.

     The Video Footage also corroborates defendants' documentary evidence

concerning C.O. Torres' use of force and contradicts plaintiff's contention that  C.O.

Torres placed him in a "rear naked chokehold."  Compl. at 4.  As discussed above, the

use of force report authored by Sgt. McCarthy and the use of force staff memoranda

authored by C.O.s Torres, Grennell, Sears, Delaney, Ray, Mitchell, and Lovejoy, all

state that a "BODY HOLD" was used to obtain control over plaintiff in an attempt to

prevent him from placing the object he removed from his buttocks area into his mouth.

See Dkt. No. 19-4 at 1, 12-13, 14-15, 16-17, 18-19, 20-21, 22-23, 24-25.  At 4:05 of the

Video Footage, while plaintiff is moving his left hand from his buttocks towards his

mouth, C.O. Torres is seen taking hold of plaintiff's upper body by placing his arms over

plaintiff's arms, and attempting to hold plaintiff's arms down away from his face, which

corroborates C.O. Torres' declaration that he used a body hold in order to prevent

plaintiff from bringing his left hand to his mouth.  See Video Footage at 4:05; Dkt. No.

19-19 at 2-3 ¶ 17.  Further, although one of the officers can be seen placing his left

hand on the back of plaintiff's neck/head momentarily, that officer removes his hand

immediately upon C.O. Torres placing his arms around plaintiff's arms, and neither C.O.

Torres nor any of the assisting C.O.s put their hands or arms around plaintiff's neck.

See Video Footage at 4:05.  The Video Footage also corroborates the portion of C.O.

Torres' declaration in which he explained that, once he placed plaintiff in a body hold,

he forced plaintiff to the floor, where he held onto plaintiff while plaintiff continued to

struggle to get free and the other C.O.s attempt to gain control over plaintiff through the

use of upper and lower body holds.  See Dkt. No. 19-19 at 3 ¶¶ 17-18; Video Footage at

4:11-7:07.  Thus, the Video Footage "blatantly contradict[s]" plaintiff's version of events

concerning the type of force used, such "that no reasonable jury could believe" plaintiff's

account of the incident.  Scott, 550 U.S. at 380.

Further, although it is difficult to see plaintiff while he is on the ground because of

the correction officers standing over him, the Video Footage also corroborates C.O.

Torres' statement that he did not render unconscious or "put [him] to sleep," as plaintiff

can be seen struggling and resisting the officers attempts to restrain him intermittently

while on the floor.  See Video Footage at 4:11-4:15, 4:30-4:34, 4:49, 5:09; Dkt. No. 19-

19 at 3 ¶ 19.  In this regard, the Video Footage also "blatantly contradict[s]" plaintiff's

allegations that he was slapped awake by officers and that he was unconscious until he

woke up in another room.  Scott, 550 U.S. at 380; see Compl. at 4.  Rather, the Video

Footage at 7:09 plainly shows correction officers assist plaintiff in standing up off the

floor, after which time plaintiff can be seen standing and conversing with the correction

officers while C.O. Lovejoy takes photographs of plaintiff.  See Video Footage at 7:07-

8:14 (plaintiff standing and conversing), id. at 8:15-9:35 (C.O. Lovejoy taking six

photographs of plaintiff).  Indeed, after standing up from the floor, plaintiff can be seen

acting visibly argumentative and physically resisting the correctional staff while C.O. Lovejoy takes his photographs.  See Video Footage at 8:15-9:35.  Moreover, at no point during the approximately 14 minutes that plaintiff was in the SHU strip frisk room did any officers slap or strike plaintiff in any manner.  See generally Video Footage.  In addition, the Video Footage between 13:34-13:39 shows plaintiff walking backwards to exit the strip frisk room under his own power with a correction officer merely guiding him with one hand on plaintiff's right arm.  See Video Footage at 13:34-13:39.

Along with the Video Footage, the undersigned has also considered the *de minimis* nature of plaintiff's injuries.  Plaintiff's medical records from his evaluation at 8:00 a.m. on May 12, 2019—taken almost immediately after the incident involving C.O. Torres—indicate that plaintiff sustained only a one-inch abrasion on his face, and that "no other injuries [were] observed."  Dkt. No. 19-6 at 1.  In addition, while plaintiff was on contraband watch on May 13 and 14, 2019, his medical records indicate "no medical concerns."  Id. at 2-3.  As discussed above in subsection IV. B. 1., supra, the one-inch abrasion on plaintiff's face is clearly a *de minimis* injury.  See Bermudez, 2013 WL 654401, at *5; James, 2008 WL 1700125, *4-5.  Further, plaintiff's medical records indicate that, on May 15 and 17, 2015—days after the May 12, 2019 incident with C.O. Torres—plaintiff informed a nurse while one sick call that he had been suffering from a sore throat, neck, and jaw pain for two days, for which he was given Motrin®.  See Dkt. No. 19-6 at 4.  On June 12, 2019, after plaintiff had filed his Complaint, he complained of "migraine" and "neck pain since 5/12/19 when [he] sa[id] he was choked by C.O."  Id. at 6.  Plaintiff's medical records also indicate that, on May 17, 2019, plaintiff "confirm[ed] some improvement" with respect to his "sore throat [and] jaw tenderness."  Id. at 4.  As

discussed above, the Video Footage and defendants' documentary evidence contradict plaintiff's contention that he was choked or grabbed by the neck.  See Dkt. No. 19-19 at 3 ¶ 25; Video Footage at 4:05.  Moreover, neither plaintiff's medical records or photographs taken immediately after the incident contain any indication that plaintiff experienced head and/or neck trauma when C.O. Torres and the assisting correction officers used body holds on May 12, 2019.  See Dkt. No. 19-6; Dkt. No. 19-7 at 1-6.  In addition, as defendants point out, plaintiff's deposition testimony concerning his alleged neck pain was equivocal at best, as he stated that sometimes ibuprofen "doesn't even do nothing," but also testified that the pain in the back of his neck was "just like a little bit" and only occurred from "time to time."  Dkt. No. 19-2 at 78; see Dkt. No. 19-28 at 27.  Thus, to the extent alleges head or neck pain as a result of C.O. Torres' use of force, plaintiff appears to allege, at most, a *de minimis* injury.

In any event, even assuming plaintiff's complaints of migraines or neck pain constitute a sufficiently serious injury, his Eighth Amendment excessive force claim against C.O. Torres still fails because he cannot establish the subjective prong (i.e. that C.O. Torres applied force maliciously and/or sadistically for the purpose of causing pain).  See Hudson, 503 U.S. at 7; see also Joseph v. Annucci, No. 18-CV-7197 (NSR), 2020 WL 409744, at *7 (S.D.N.Y. Jan. 23, 2020) ("For a prisoner to prevail on a claim asserting that he was subjected to cruel and unusual punishment, he must prove both 'an objective element   . . . and a subjective element.'" (emphasis added) (quoting Farmer, 511 U.S. 825 at 834 (additional citation omitted))).  Here, contrary to plaintiff's assertion that defendants "manufactured a security contraband retrieval story to justify the SHU portion of the assault" and used force against him "for sport," Dkt. No. 24 at 6,

7, the Video Footage and supporting documentary evidence, including C.O. Torres'

declaration and Sgt. McCarthy's use of force report, clearly establish that C.O. Torres

and the assisting correction officers applied body holds "in a good-faith effort to maintain

[and] restore discipline" when plaintiff, an intoxicated and noncompliant inmate, was

attempting to ingest potential contraband—not "maliciously and sadistically [to] cause[]

harm." Hudson, 503 U.S. at 7; see Scott, 344 F.3d 291. Indeed, defendants have

established that the use of force—which consisted of restricting plaintiff's movement

through the use of upper and lower body holds—was proportional to the force needed to

prevent plaintiff from swallowing the object in light of the reasonably perceived threat

that he would ingest contraband. See Scott, 344 F.3d 291. Further, plaintiff proffers no

allegations whatsoever concerning C.O. Torres' mental state, aside from the conclusory

assertions that unnamed correctional staff targeted him because, according to plaintiff,

"a group of officers . . . assumed that he was a gang member." See Dkt. No. 24 at 5;

Compl. at 4-5; see Scott, 344 F.3d at 291. Such conclusory and self-serving

statements, made for the first time in opposition to defendants' motion for summary

judgment, fail to raise a genuine dispute of material fact. See Dkt. No. 24; See Scott,

344 F.3d at 287; see also McKinney v. Dzurenda, 555 F. App'x 110, 111-12 (2d Cir.

2014) (summary order) ("[V]iewing the video footage together with the other evidence,

no reasonable fact-finder could conclude that the defendants used force against [the

plaintiff] maliciously or sadistically to cause harm."); Houston v. Horn, No. 09-CV-801

(DLC), 2010 WL 1948612, at *12 (S.D.N.Y. May 13, 2010) (concluding that the plaintiff

failed to satisfy subjective element of excessive force claim where he failed to submit

proof that contradicted evidence that correction officers used force only in order to restore discipline after the plaintiff failed to comply with an officer's order.).

As a final matter, defendants have established entitlement to summary judgment insofar as plaintiff alleges that he suffers from PTSD as a result of the May 12, 2019 incidents.  See Dkt. No. 24 at 9; Dkt. No. 25 at 14.  Although plaintiff's medical records indicate that he requested to resume the use of Zoloft© in November 2019, his medical records are devoid of treatment or diagnosis for PTSD and make no reference to the May 12, 2019 incidents; rather, plaintiff's medical records indicate only that he was placed on psychiatric medication after being admitted to DOCCS to cope with anxiety, depression, anger, and sleep issues.  See Dkt. No. 27 at 9, 22, 28.  Indeed, aside from plaintiff's conclusory and self-serving allegations made in opposition to defendants' motion, the record before the Court is devoid of any causal link between the May 12, 2019 incidents and plaintiff's request to be restart his regimen of psychiatric medication. See id.  Based on the foregoing, it is recommended that plaintiff's Eighth Amendment excessive force claim against C.O. Torres be dismissed with prejudice.

In sum, the undersigned concludes that defendants have established entitlement to summary judgment based on plaintiff's failure to exhaust administrative remedies and failure to establish claims for Eighth Amendment excessive force or failure to intervene. Consequently, it is recommended that defendants' motion be granted in its entirety and plaintiff's Complaint be dismissed in its entirety with prejudice.  Based on the foregoing, the undersigned declines to consider the parties' alternative arguments addressing qualified immunity.

## V. Conclusion

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that defendants' Motion for Summary Judgment (Dkt. No. 19) be **GRANTED IN ITS ENTIRETY** and that plaintiff's Complaint (Dkt. No. 1) be **DISMISSED IN ITS ENTIRETY WITH PREJUDICE**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72.[8]

Dated: February 8, 2021
Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[8] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).